UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENATE CORDTS-AUTH, individually and as a
member in Crunk, LLC, suing on behalf of herself and
all others similarly situated,

                                        Plaintiff,

        -v-


CRUNK, LLC, d/b/a CRUNK JUICE LLC and/or
CRUNK ENERGY DRINK, SOLVI BRANDS, LLC,
CATHERINE F. HALSTEAD, SAMUEL S.
HOLDSWORTH, LOEB & LOEB, LLP, ROBERT B.
LACHENAUER, CATHERINE F. HALSTEAD
REVOCABLE TRUST, PETER A. HALSTEAD
REVOCABLE TRUST, TIA TIPPET LAURENT
TRUST, OLIVER NICOLAS LAURENT TRUST,
2003 IRREVOCABLE S CORPORATION TRUST
AGREEMENT OF ELIZA FINKELSTEIN DATED
JANUARY 1, 2003, 2003 IRREVOCABLE S
CORPORATION TRUST AGREEMENT OF
JENNIFER FINKELSTEIN DATED JANUARY 3,
2003, MATTHEW FRANK, MARK FRANK,
ALEXANDRA FRANK, RUSSELL FRANK, BISON
HOLDINGS CORP., TEDRIC HOLDSWORTH,
LYDIA HOLDSWORTH, ERIC HOLDSWORTH,
ARIEL HOLDSWORTH, WILLIAM MAYHER,
DOUGLAS LACHANCE, PAMELA PUTNEY,
SARAH MALM, KAREN MALM, GARFIELD
SMITH, and TOM MAHLKE,

                                        Defendants.

Case No. 09-CV-8017 (KMK)

OPINION AND ORDER

Appearances:

Christopher G. Kirby, Esq.
The Scher Law Firm, LLP
Carle Place, New York
*Counsel for Plaintiff*

Danielle Lauren Rose, Esq.
Steven Gary Kobre, Esq.

Scott Kurtis McCulloch, Esq.
Kobre & Kim LLP
New York, New York
*Counsel for the Crunk Defendants*

Claire L. Huene, Esq.
Joel M. Miller, Esq.
Miller & Wrubel, P.C.
New York, New York
*Counsel for the Loeb Defendants*

KENNETH M. KARAS, District Judge:

Renate Cordts-Auth ("Plaintiff") brings this action against Crunk, LLC ("Crunk"), Solvi

Brands, LLC ("Solvi"), Catherine Halstead ("Halstead"), Samuel Holdsworth ("Holdsworth"),

and about twenty investors in Solvi (collectively, "the Crunk Defendants"), as well as against

Loeb & Loeb, LLP ("Loeb") and Robert Lachenauer ("Lachenauer") (collectively, "the Loeb

Defendants") (collectively, "Defendants"), seeking a declaratory judgment that Plaintiff was a

member of Crunk and demanding access to records and an accounting in connection with the

sale of Crunk to Solvi.  Plaintiff also asserts derivative claims for breach of fiduciary duty,

tortious interference, and legal malpractice, and a direct claim for breach of contract.  The Crunk

Defendants move to dismiss pursuant to Federal Rule of Civil Prodecure 12(b)(6), arguing that

Plaintiff lacks standing to bring derivative claims on behalf of Crunk, and that Plaintiff's other

claims fail as a matter of law.  The Loeb Defendants, against whom only claims for breach of

fiduciary duty and legal malpractice are asserted, contend that the Court lacks subject matter

jurisdiction over this matter and separately move to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(1).[1]  Plaintiff moves to amend the Amended Complaint, seeking to add a cause

---

[1] The Loeb Defendants join in the Crunk Defendants' standing argument, should the Court grant the Crunk Defendants' motion on that ground.  (Mem. of Law in Supp. of Defs. Loeb & Loeb LLP's & Robert B. Lauchenauer's Mot. to Dismiss ("Loeb Defs.' Mem.") 1.)

of action for constructive trust against the Crunk Defendants.  For the reasons stated herein, Defendants' motions are granted and Plaintiff's motion is denied.

I. Background

A. Facts

The Court assumes the following facts, as alleged in the Amended Complaint, to be true for purposes of the instant motion.  Crunk, the manufacturer of a line of "high energy" soft drinks known as "Crunk Energy Drink," was created in 2003 by Sidney E. Frank ("Frank"), who, at the time, was founder and CEO of Sidney Frank Importing Company ("SFIC").  (Am. Compl. ¶¶ 36-37.)  Frank had previously achieved success in marketing Grey Goose Vodka ("Grey Goose") and Jagermeister liqueur.  (*Id.* ¶ 37.)  In or about 2004, Frank made a capital contribution of approximately $6.6 million to Crunk.  (*Id.* ¶ 38.)  The money used for this investment was obtained through a personal loan to Frank from SFIC, which was subsequently repaid in full.  (*Id.* ¶ 39.)  In or about March 2004, the Limited Liability Company Agreement of Crunk, LLC (the "Original Crunk Operating Agreement") was amended to reflect Frank's capital contribution.  (*Id.* ¶ 40; *see also id.* Ex. B (Amended and Restated Limited Liability Company Agreement of Crunk, LLC (the "Amended Crunk Operating Agreement" or the "Crunk Operating Agreement")).)

In or about April 2004, the Amended Crunk Operating Agreement was amended once more to reflect the addition of several "Performance Unit Holders."  (*Id.* ¶ 41; *see also id.* Ex. C (Amendment to Amended Crunk Operating Agreement).)  "Performance Units" are defined in the Amended Crunk Operating Agreement as "compensation for services where [Crunk] desires that the grantee's interest be limited to the post-grant date appreciation of the Company as contrasted with the grant date fair market value that would otherwise then be realized by the

3

Company in an arms' length sale and, hence, that such grantee receive only a 'profits' interest for Federal income tax purposes."  (Am. Compl. Ex. B § 3.3(a).)  In other words, upon granting a Performance Unit, an appraisal of the company's value is conducted, and in the event of the company's sale, a holder of a Performance Unit receives only a share of the net proceeds that are greater than that appraisal value (the "Grant Floor Value").  (*See id.* Ex. B § 3.3(b).)  Therefore, where a sale nets proceeds that are less than the Grant Floor Value, a Performance Unit holder receives no compensation, because Performance Units are only a "profits interest."  The Grant Floor Value associated with Plaintiff's Performance Units was $2 million, meaning that Plaintiff could profit from a Crunk sale only if such sale netted greater than $2 million, or alternatively if Crunk was sold in gross for more than $8.66 million — that is, a value greater than Frank's initial contribution of $6.66, which would need to be repaid upon any sale, plus $2 million.

Plaintiff was employed with SFIC for approximately 18 years as a "key employee . . . overseeing all aspects of administration."[2]  (*Id.* ¶ 45.)  Plaintiff also assisted Frank in the operation of a number of other entities, including Crunk.  (*Id.* ¶ 46.)  In short, Plaintiff alleges, she was a highly-valued asset to Frank, and accordingly, in or about March 2005, Plaintiff entered into a Performance Unit Grant Agreement with Crunk, pursuant to which she was granted 384,615 Performance Units as consideration for her services to Crunk.  (*Id.* ¶¶ 47-50; *see also id.* Ex. D.)  On March 10, 2005, under the terms of the Performance Unit Grant Agreement, the Amended Crunk Operating Agreement was amended once more to reflect the addition of Plaintiff as a Performance Unit holder.  (*Id.* ¶ 51; *see also id.* Ex. E (Second Amendment to

---

[2] In consideration for her services to SFIC, Plaintiff received an equitable stake in Grey Goose.  Grey Goose was eventually sold for over $2 billion, and Plaintiff received $17 million for her stake.  (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Crunk Defs.' Mem.") 1; Mem. of Law Submitted in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem.") 2.)

Amended Crunk Operating Agreement ("Crunk Operating Agreement")).)[3]  Plaintiff thereafter performed services as an employee of Crunk.  (*Id.* ¶ 53.)

Sidney Frank died on January 10, 2006, leaving the administration of SFIC and Crunk to his daughter, Defendant Halstead.  (*Id.* ¶¶ 55, 58.)  Specifically, Halstead became chairwoman of SFIC and manager and principal executive of Crunk.  (*Id.* ¶¶ 56-57.)  Halstead's husband, Peter Halstead, began serving as principal advisor to Crunk's management personnel, including Plaintiff.  (*Id.* ¶ 59.)  In or about March 2006, Peter Halstead allegedly informed Plaintiff of his wife's intent to devalue Crunk's Performance Units and to issue new units, to restructure Crunk and re-launch the company with new investors, and to defraud Crunk's existing investors.  (*Id.* ¶¶ 60-63.)  Following Plaintiff's objection to these actions, on February 9, 2007, she was allegedly removed from her positions at SFIC and Crunk, without notice, by Defendant Halstead. (*Id.* ¶¶ 64-66.)  On March 9, 2007, Plaintiff, SFIC, and Crunk entered into a separation agreement (the "Separation Agreement") wherein Plaintiff agreed to resign from her positions at SFIC and Crunk and to receive $2,000,000 in consideration.  (*Id.* ¶¶ 67-69; *see also id.* Ex. F (the Separation Agreement).)  Plaintiff alleges she retained ownership of her Performance Units. (*Id.* ¶ 70.)

Halstead allegedly pursued a course of intentionally devaluing Crunk "in order to render it insolvent, thereby extinguishing the rights of existing performance unit holders, like [] Plaintiff."  (*Id.* ¶ 71.)  In a letter written by Halstead and addressed to Plaintiff, dated March 29,

---

[3] The Court notes that, according to Defendants, the Amended Crunk Operating Agreement was superceded by a Second Amended and Restated LLC Agreement, dated April 1, 2005.  (Crunk Defs.' Mem. 5 n.4; Decl. of Danielle L. Rose ("Rose Decl.") Ex. 2.)  However, because the Parties refer in their submissions to the Crunk Operating Agreement, the Court will refer to the Crunk Operating Agreement by this name as well.

2007 (*id.* Ex. G), Halstead claimed that in 2006, Crunk lost approximately $1,500,000 and that Crunk was projected to lose its remaining cash investments during the upcoming fiscal year. (*Id.* ¶¶ 72-73.) In the letter, Halstead stated that Crunk had been sold, as of February 28, 2007, to Defendant Solvi for approximately $550,000. (*Id.* ¶ 75; *id.* Ex. G (describing the "Crunk sale").) In the letter, Halstead informed Plaintiff that she would receive no proceeds from the Crunk sale, as the Performance Units were "profits-only" interests, meaning that Plaintiff would receive a share of the net proceeds only: (1) after the initial investors were returned the amount of their contributions; and (2) if the value of the remaining proceeds exceeded $2 million, the Grant Floor Value of Plaintiff's Performance Units. (*Id.* ¶¶ 76-77; *id.* Ex. G.) As Sidney Frank was the only initial investor in Crunk, Halstead stood to receive the proceeds from the Crunk sale as Frank's heir. (*Id.* ¶¶ 78-79.) Following Crunk's sale, Halstead dissolved Crunk on or about May 18, 2007. (*Id.* ¶ 81; *see also id.* Ex. H.)

Plaintiff claims that Defendant Solvi, which was formed on or about January 31, 2007, was created for the "sole purpose" of purchasing Crunk and distributing its products. (*Id.* ¶¶ 83-84.) Halstead served as manager of Solvi, and Defendant Holdsworth was chairman of Solvi's board of directors. (*Id.* ¶¶ 85-86.) Plaintiff alleges that Holdsworth had actual and constructive knowledge of Halstead's intent to devalue Crunk and to re-launch Crunk with new investors, and that Holdsworth facilitated and profited from the Crunk sale. (*Id.* ¶¶ 112-18.) In or about February 2007, Solvi "purportedly" received $2,460,000 in capital contributions, from various investors named here as Defendants, as consideration for the purchase of "Common Units" of Solvi. (*Id.* ¶¶ 87-111.) Solvi allegedly never received the consideration paid to it by the investors. (*Id.* ¶ 119.) Solvi has allegedly produced and marketed Crunk Energy Drink since its purchase of Crunk. (*Id.* ¶ 134.) The re-launched Crunk has allegedly been successful, achieving

6

annual sales of approximately $8,000,000, expanding its product portfolio, and entering new markets. (*Id.* ¶¶ 135-36.)

On or about February 12, 2009, Plaintiff requested an accounting from the re-launched Crunk of the proceeds from the Crunk sale, but this request went unheeded. (*Id.* ¶¶ 137-38.) On or about March 11, 2009, Plaintiff demanded from the re-launched Crunk a copy of the "Purchase and Sale Agreement" between Crunk and Solvi, the identities of all former interest-holders in Crunk, and current interest-holders in Solvi, and threatened legal action if these demands were not met. (*Id.* ¶ 139; *id.* Ex. Q.) This demand was rejected by an attorney for the re-launched Crunk, who threatened legal action based on Plaintiff's demands, citing the Separation Agreement, wherein Plaintiff agreed not to commence any legal action against Crunk. (*Id.* ¶¶ 140-41; *id.* Ex. R.) Plaintiff thereafter commenced this suit, asserting six causes of action against the Crunk Defendants, including at least one direct claim, several derivative claims, and various claims for equitable relief.

As to the Loeb Defendants, Plaintiff alleges that their representation of both Crunk and Solvi during the Crunk sale constituted a clear conflict of interest, and that because Halstead signed the sales contract on behalf of both Crunk, as seller, and Solvi, as purchaser, the deal was not an arms-length transaction. (*Id.* ¶¶ 121-33.) Plaintiff asserts two derivative claims against the Loeb Defendants, one for legal malpractice and the other for breach of fiduciary duty.

B. Procedural History

Plaintiff filed an initial Complaint on September 18, 2009. (Dkt. No. 1.) On June 3, 2010, Plaintiff filed an Amended Complaint. (Dkt. No. 16.) Defendants filed their motions to dismiss on September 10, 2010. (Dkt. Nos. 25, 28.) On October 19, 2010, Plaintiff filed a

7

motion to amend the Amended Complaint.  (Dkt. No. 38.)  The Court held oral argument on
June 2, 2011.

## II. Discussion

### A. Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's
factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."  *Gonzalez
v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*,
514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint
pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all
reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)).  Generally, in
adjudicating a Rule 12(b)(6) motion, a district court "confines its consideration to facts stated on
the face of the complaint, in documents appended to the complaint or incorporated in the
complaint by reference, and to matters of which judicial notice may be taken."  *Meisel v.
Grunberg*, 651 F. Supp. 2d 98, 107 (S.D.N.Y. 2009) (alteration omitted) (quoting *Leonard F. v.
Isr. Disc. Bank of  N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)).  "The court may . . . consider matters
of which judicial notice may be taken, even if the corresponding documents are not attached to
or incorporated by reference in the complaint."  *Munno v. Town of Orangetown*, 391 F. Supp. 2d
263, 268 (S.D.N.Y. 2005); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.
1991) (holding that district court properly took judicial notice of public documents filed with the
SEC).  In the motion to dismiss context, however, a court should generally take judicial notice
"to determine what statements [the documents] contain[] . . . not for the truth of the matters
asserted."  *Kramer*, 937 F.2d at 774.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration,

citations, and internal quotation marks omitted).  Instead, the Supreme Court has emphasized

that "[f]actual allegations must be enough to raise a right to relief above the speculative level,"

*id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege

"enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  If a plaintiff

"ha[s] not nudged [her] claims across the line from conceivable to plausible, [her] complaint

must be dismissed."  *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.  But where

the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled

to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

    The Loeb Defendants, while joining in the Crunk Defendants' motion to dismiss pursuant

to Rule 12(b)(6), also move to dismiss for the alternative reason that the Court lacks subject

matter jurisdiction to adjudicate this matter.  Pursuant to Federal Rule of Civil Procedure

12(b)(1), a court must dismiss a claim if the court "lacks the statutory or constitutional power to

adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal

quotation marks omitted)), *aff'd*, 130 S. Ct. 2869 (2010).  "The plaintiff bears the burden of

proving subject matter jurisdiction by a preponderance of the evidence."  *Aurecchione v.

Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  In deciding a Rule 12(b)(1)

9

motion to dismiss, the Court "'must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,'" *Morrison*, 547 F.3d at 170 (quoting *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006)) (citation and internal quotation marks omitted), but "'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it,'" *id.* (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).   In deciding the motion, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

     B. Analysis

          1. Derivative Claims

               a. Standing

Under New York law, a claim is considered derivative where "the remedy sought is for the wrong done to the [business entity]." *Billings v. Bridgepoint Partners, LLC*, 863 N.Y.S.2d 591, 593 (Sup. Ct. 2008) (alteration and internal quotation marks omitted).[4]  "The primary cause of action belongs to the [business entity]," and "recovery must inure to the benefit of the [business entity]." *Id.* (internal quotation marks omitted).  Accordingly, "the determination of

---

[4] The Parties do not dispute that New York law governs Plaintiff's derivative claims, which are brought on behalf of Crunk, an LLC organized under the laws of New York.  (*See* Am. Compl. Ex. B.)

whether a claim is direct or derivative turns on who was harmed first, the member or the entity."
*Id.*; *see also Bischoff v. Boar's Head Provisions Co.*, 436 F. Supp. 2d 626, 633 (S.D.N.Y. 2006)
(holding that a claim was derivative, and thus "belong[ed] to the LLC," because "to the extent
that [the plaintiff was] injured, that injury flow[ed] from his status as a member of [the LLC]").

        Several of Plaintiff's claims are derivative in nature — that is, Plaintiff purports to assert
these claims on behalf of Crunk to vindicate injuries allegedly suffered by Crunk.  Plaintiff
acknowledges that her breach of fiduciary duty and tortious interference claims are "derivative to
the extent that [she] asserts that the Crunk Defendants injured Crunk by rendering it insolvent
and causing it to be sold for an artificially lowered value."  (Mem. of Law Submitted in Opp'n to
Defs.' Mot. to Dismiss ("Pl.'s Mem.") 7.)  Additionally, her claims against the Loeb Defendants
for legal malpractice and breach of fiduciary duty, which allege that the Loeb Defendants "failed
to exercise a reasonable standard of care toward [Crunk]" (Am. Compl. ¶¶ 233, 239), and
breached their fiduciary duty of loyalty to Crunk (*id.* ¶¶ 242-253), are also derivative, as they
seek to vindicate harms allegedly done to Crunk.

        In New York, it is well-settled that a shareholder seeking to bring a derivative claim on
behalf of a corporation, in order to have standing, must have been a shareholder both at the time
of the alleged wrongdoing, and at the time the suit is filed.  *See Indep. Investor Protective
League v. Time, Inc.*, 406 N.E.2d 486, 488 (N.Y. 1980); *Tenney v. Rosenthal*, 160 N.E.2d 463,
466 (N.Y. 1959).  New York courts have extended this rule to LLCs, finding that membership in
the LLC is a prerequisite for a member to have standing to bring a derivative action on behalf of
the LLC.  *See Billings*, 863 N.Y.S.2d at 595 ("[C]onclud[ing] that a member of a limited liability
company may sue derivatively, but that such a member seeking derivative relief must have been
a member at the time of the offending conduct and at the time the action was commenced."); *see*

*also McGuire Children, LLC v. Huntress*, 889 N.Y.S.2d 883 (Table), 2009 WL 1693725, at *20 (Sup. Ct. June 17, 2009) (finding that entity did not have standing to pursue derivative action where it was no longer a member of the LLC).

The Crunk Defendants argue that because Plaintiff was not a member of Crunk, either at the time of the alleged misconduct or at the time she filed suit, she lacks the requisite standing to bring any derivative claims on behalf of Crunk.  (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Crunk Defs.' Mem.") 13-17.)[5]  Indeed, the Court is unconvinced that Plaintiff was ever a member of Crunk.[6]  Article IX of the Crunk Operating Agreement sets forth the procedure through which an individual may acquire membership in Crunk.  (Am. Compl. Ex. B art. IX.)  Specifically, section 9.2 sets forth four conditions that *each* must be satisfied before an individual may become an "Additional Member" of Crunk:[7]

> (a) if the Company is selling, assigning or otherwise issuing Units to such Person, the Board, it its sole and absolute discretion, determines the nature and amount of

---

[5] The Loeb Defendants argue that Plaintiff was a member of Crunk when she filed this action, and therefore, because the citizenship of an LLC is determined by the citizenship of all of its members, *see Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000), and because an LLC is a necessary party in a derivative action on its behalf, *see Weber v. King*, 110 F. Supp. 2d 124, 133 (E.D.N.Y. 2000), this Court lacks subject matter jurisdiction because there is no diversity of citizenship.  (Loeb Defs.' Mem. 2-3.)  *See also Bischoff*, 436 F. Supp. 2d at 634 (remanding derivative action against LLC because the court lacked diversity jurisdiction).  However, as explained below, the Court finds that Plaintiff was not a member of Crunk when she filed this action.  Therefore, because no member of Crunk shares Plaintiff's citizenship, and Plaintiff sues only Crunk, its members, and other diverse Parties, the Court finds that there is diversity jurisdiction over Plaintiff's derivative claims.

[6] After oral argument, the Court issued an order directing the parties to address this question.  (Dkt. No. 44.)  The parties timely complied with that order.

[7] "Additional Member" is defined as "a person who (i) has acquired Units from the Company after the Effective Date or is an Assignee, and (ii) has been admitted as a Member of the Company pursuant to Section 9.2 hereof."  (Am. Compl. Ex. B, at Ex. A.)  In other words, mere ownership of Performance Units was not sufficient to become a member of Crunk.

the Unit Consideration to be made by such Person;

(b) if the Company is selling, assigning or otherwise issuing Units to such Person, the Board has received, on behalf of the Company, such Person's Unit Consideration as so determined;

(c) Members holding a minimum of Two-Thirds (2/3) of the Class A Units then outstanding consent in writing to such admission, which consent may be given or withheld in the Member's sole and absolute discretion; and

(d) the Board receives those written instruments it reasonably deems necessary and appropriate, (including, without limitation, such Person's consent to be bound by this Agreement as a Member) that are in a form reasonably satisfactory to the Board.

(*Id.* Ex. B § 9.2.)

Plaintiff argues that she has adequately pled that she satisfied each of these conditions. As to the first two conditions, Plaintiff asserts that the Amended Complaint clearly lays out that she received Performance Units "as consideration for services to be rendered as an employee of [] Crunk" (*id.* ¶ 50), and that she thereafter "performed [such] services," for Crunk, (*id.* ¶ 53). (*See* Letter from Christopher J. Kirby, Esq. to the Court ("Kirby Letter") (Aug. 15, 2011) 4-5.) This transaction was memorialized in the Performance Unit Grant Agreement, executed by Plaintiff and Jeffrey P. Peace ("Peace"), the manager of Crunk, on March 10, 2005 (Am. Compl. Ex. D.), and is reflected in the Crunk Operating Agreement, which was amended to add Plaintiff as a "party." (*Id.* ¶ 52; *id.* Ex. E.)[8] As Defendants point out, however, this exchange of Performance Units for services does not satisfy the Crunk Operating Agreement's requirement that potential members provide *Unit Consideration* to Crunk. (Letter from Danielle L. Rose, Esq. to the Court ("Rose Letter") (Aug. 15, 2011) 3-5.) As Defendants note, the Crunk

_____

[8] The Court may consider the Amended Operating Agreement, as it is attached to the Amended Complaint. *See Meisel*, 651 F. Supp. 2d at 107.

13

Operating Agreement specifically defines "Unit Consideration" as "Capital Contributions" made to Crunk in exchange for "Units."  (Am. Compl. Ex. B § 3.2(a).)  "Capital Contributions," in turn, are defined as "any contribution of cash or property to the Company or the obligation to contribute cash or property to the Company made by or on behalf of a Member."  (*Id.* Ex. B, at Ex. A.)  Thus, Plaintiff's claim that she provided services to Crunk in exchange for Performance Units is of no import, because these "services" are categorically different from the "cash or property" that, by the very terms of the Crunk Operating Agreement, Plaintiff would have needed to provide to attain membership in Crunk.  The term "Capital Contributions," as clearly defined in the Crunk Operating Agreement, does not include services rendered as a form of contribution.  If anything, the Performance Units appear to have been Plaintiff's consideration for her services rendered.  Despite Plaintiff's assertions, therefore, the Court concludes that Plaintiff has failed to allege that she satisfied the first two conditions for membership in Crunk — i.e., she has failed to demonstrate that the Board determined the nature and amount of her Unit Consideration, and that she in fact provided such Unit Consideration to Crunk.

As to the third condition, Defendants correctly note that, "Plaintiff neither alleges, nor does she attach any document to her complaint which shows, that Sidney Frank, the Member then holding all Class A Units, gave his written consent to Plaintiff becoming an Additional Member."  (Rose Letter 5; *see also* Am. Compl. Ex. E, at Ex. C (listing Sidney Frank as the sole holder of Class A Units).)  Plaintiff weakly counters that "[t]he Performance Unit Grant Agreement itself establishes that the Class A Unit holders (*i.e.*, Mr. Frank) authorized Plaintiff's membership in Crunk."  (Kirby Letter 5.)  This conclusory statement is plainly misguided, as that agreement was not even signed by Frank, and thus could not constitute written consent of the Class A Unit holders, as required by section 9.2(c).  Further, section 2 of the Performance

14

Unit Grant Agreement stated that Plaintiff was "required to become a Member of the LLC" as soon as practicable after acquiring her Performance Units, in accordance with section 9.2, clearly suggesting that the grant of those units and the acquisition of membership in Crunk were two distinct events.  (Am. Compl. Ex. D § 2.)  Accordingly, Plaintiff's reliance on the Performance Unit Grant Agreement in demonstrating that she satisfied the final condition of section 9.2 fails as well.  While Plaintiff is correct that the contract is evidence of Plaintiff's status as a Performance Unit holder and of her consent to be bound to the Crunk Operating Agreement in that capacity (*see* Am. Compl. Ex. D), it does not reflect Plaintiff's "consent to be bound by [the Crunk Operating Agreement] as a *Member*," (*id.* Ex. B § 9.2(d) (emphasis added)).  Rather, the Performance Unit Grant Agreement contemplated that Plaintiff could become a member, but only if she satisfied the conditions for doing so under the Crunk Operating Agreement.

Finally, Plaintiff points to other provisions of the Crunk Operating Agreement that she claims are clear indicators that she was a member of Crunk.  For example, section 3.4 states: "Exhibit C shall reflect the number of Units held by each Member as of the date stated thereon. The Board shall have the right, without further consent or approval of any Member, to amend such Exhibit from time to time as is necessary to reflect changes in Units ownership."  (*Id.* Ex. B § 3.4.)  Exhibit C to the Crunk Operating Agreement, in turn, shows that Peace amended the Crunk Operating Agreement to list Plaintiff as a holder of Units.  (*Id.* Ex. E, at Ex. C.)  This amendment, according to Plaintiff, is clear evidence that she was a member of Crunk.  (*See* Kirby Letter 7.)  However, section 9.1 expressly requires that "[n]o Person shall be admitted to the Company as a Member . . . except in accordance with Section 9.2."  (Am. Compl. Ex. B § 9.1.)  Peace's amendment to the Crunk Operating Agreement, standing alone, would not be sufficient to overcome the other deficiencies in Plaintiff's claim of membership; in other words,

15

the mere appearance of Plaintiff's name on Exhibit C would not establish her membership in Crunk if she had not otherwise satisfied each of the conditions listed in section 9.2, which as noted above, Plaintiff had not.[9]

In short, contrary to what Plaintiff may believe, she did not become a member in Crunk merely by receiving her Performance Units.  Rather, Plaintiff was an "Assignee," defined by the Crunk Operating Agreement as "a transferee or holder of Units that is not a Member."  (Am. Compl. Ex. B, at Ex. A.)  While it is indisputable that Plaintiff has adequately pled that she was a Performance Unit holder until Crunk was dissolved, by her own allegations (including the documents attached to the Amended Complaint) Plaintiff did not meet any of the conditions of section 9.2.  Therefore, Plaintiff has failed to adequately plead that she ever attained membership in Crunk, and the Court dismisses her derivative claims on this ground alone.  *See Billings*, 863 N.Y.S.2d at 595.[10]

Even assuming that Plaintiff was a member of Crunk at one time, she does not dispute Defendants' contention that she was not a member of Crunk when she filed this suit.  (*See* Pl.'s

---

[9] Defendants correctly note that, under the Crunk Operating Agreement, Peace did not have the power to amend the Crunk Operating Agreement's membership requirements; rather, only a "Majority of Members" (defined as the majority of Class A Unit holders) could approve of such amendments, and only upon written consent.  (Rose Letter 5; *see also* Am. Compl. Ex. B § 16.1; *id.* Ex. B, at Ex. A.)

[10] Moreover, as Defendants note, any doubt on this question is resolved by the Second Amended Operating Agreement, which was signed by Frank, and which deleted the Exhibits to the Amended Operating Agreement identifying Plaintiff as a Unit holder.  The Second Amended Operating Agreement was otherwise similar to the Amended Operating Agreement.  It may be considered by the Court because it forms the basis of Plaintiff's breach of contract claim.  *See Am. Auto Ins. Co. v. Rest Assured Alarm Sys.*, No. 08-CV-11013, 2011 WL 2020176, at *3 (S.D.N.Y. Mar. 31, 2011).  However, even if this document is not considered for purposes of this motion, the result is the same based on the Crunk Operating Agreement that Plaintiff attached to her Amended Complaint.

Mem. 8 ("Plaintiff does not appear to meet the burden of demonstrating that she was an interest holder in Crunk at the time this [a]ction was commenced and does not appear to be able to sustain a derivative action under New York law.").)  Indeed, no allegation in the Amended Complaint says that Plaintiff was a member at the time she initiated this action, and such a failure would ordinarily be fatal to her derivative claims.  Nevertheless, Plaintiff counters that "New York and many other jurisdictions . . . recognize an 'equity-based' exception to the continuous ownership requirement for derivative suits in circumstances in which [a plaintiff] was divested of his or her ownership through fraud."  (*Id.*)  Plaintiff is correct that courts in several jurisdictions, including New York, have recognized an equitable exception to the general rule requiring a plaintiff to have an ownership interest at the time of commencing suit, which may be invoked where the transaction itself is the subject of alleged fraud.  *See, e.g.*, *In re Guidant Corp. S'holders Derivative Litig.*, No. 03-CV-955, 2008 WL 833502, at *6-7 (S.D. Ind. Mar. 27, 2008) (discussing the "fraud exception" recognized by Delaware courts); *Kolancian v. Snowden*, 532 F. Supp. 2d 260, 262 (D. Mass. 2008) (same); *In re Mercury Interactive Corp. Derivative Litig.*, 487 F. Supp. 2d 1132, 1137 (N. D. Cal. 2007) (discussing the "equitable merger exception" recognized in *Miller v. Steinbach*, 268 F. Supp. 255, 266-67 (S.D.N.Y. 1967)); *Arnett v. Gerber Scientific, Inc.*, 566 F. Supp. 1270, 1273 (S.D.N.Y. 1983) (same); *Lewis v. Ward*, 852 A.2d 896, 905 (Del. 2004) (outlining the Delaware fraud exception); *Lewis v. Anderson*, 477 A.2d 1040, 1046 & n.10 (Del. 1984) (same); *see also Price v. Upper Chesapeake Health Ventures*, 995 A.2d 1054, 1065-67 (Md. Ct. Spec. App. 2010) (discussing both the *Miller* and *Lewis* lines of cases).  Defendants correctly argue, however, that none of these cases was decided under New York law, and thus there is no indication that a fraud exception to derivative standing requirements would apply to a New York LLC such as Crunk.  *See Lichtenberg v.*

17

*Besicorp Grp. Inc.*, 43 F. Supp. 2d 376, 387 n.9 (S.D.N.Y. 1999) (noting that although "Delaware courts recognize an exception to th[e] rule [requiring continuous ownership] if the sole purpose of the merger is to deprive shareholders of standing to bring or maintain derivative suits . . . there is no indication that New York courts would recognize such an exception."). Indeed, neither *Miller* nor *Arnett* applied New York law; the former was decided under Pennsylvania law, the latter under federal law governing derivative actions. Therefore, it is far from certain whether such an exception would be adopted in New York.

However, even assuming that New York courts would apply an equitable exception to the continuous ownership requirement, Plaintiff does not fit into any of the exceptions that have been adopted by the courts. For example, Delaware's fraud exception applies "if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action." *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 354 (Del. 1988) (citing *Lewis v. Anderson*, 477 A.2d at 1046 n.10). A plaintiff seeking to invoke this fraud exception must plead particularized facts demonstrating that the merger was fraudulent and done solely to avoid liability in a derivative action. *See Ward*, 852 A.2d at 905. In *Ward*, the court found that the plaintiff had failed to plead sufficiently particularized facts from which to conclude that the transaction at issue was fraudulent and perpetrated merely to deprive the plaintiff of her standing to maintain a pre-merger derivative action. Specifically, the court agreed with the lower court's reasoning that "for it to [have made] economic sense for [defendant] to enter into the merger solely to eliminate the plaintiff's derivative claims, [defendant's] potential liability from the plaintiff's derivative action would have needed to be greater than the financial loss it would have experienced by accepting an inadequate price for its . . . shares." *Id.* at 905. The court held that plaintiff failed to "identify with any precision the

18

magnitude of her claims," and thus "the absence of well-pled facts suggesting that the liability [defendants] faced was so substantial as to have motivated them to [consummate] a pretextual merger with another publicly traded company at a sub-optimal price is fatal." *Id.* at 905-06 (internal quotation marks omitted).

Here, Plaintiff alleges that the Crunk sale was conducted in order to "wipe out" and "extinguish" the Performance Unit holders.  (Am. Compl. ¶¶ 74, 80.)  While these are, no doubt, serious allegations, they are different from the allegations in the cited cases applying Delaware's fraud exception.  *See In re Guidant Corp.*, 2008 WL 833502, at *7 (alleging that merger was effectuated merely to eliminate plaintiff's standing in *pending* derivative action); *Kolancian*, 532 F. Supp. 2d at 263-64 (same); *Ward*, 852 A.2d at 897-98 (same); *Kramer*, 546 A.2d at 354-55 (noting inapplicability of the fraud exception because plaintiff did not allege that the merger was effectuated merely to eliminate *pending* derivative claim).  Here, there were no existing derivative claims at the time of the Crunk sale.  As the Delaware Supreme Court made clear in *Ward*, a plaintiff seeking to invoke the fraud exception must allege not only that the transaction in question was fraudulent, but that the transaction was also "*done merely to eliminate derivative claims.*"  *Ward*, 852 A.2d at 905 (emphasis added).  While Plaintiff has alleged that the Crunk sale was fraudulent, she has not alleged that it was done merely to eliminate derivative claims, because there were no pending derivative claims at the time of the sale.  Further, even assuming that the Court could equate the alleged elimination of the Performance Unit holders with the elimination of a pending derivative claim, Plaintiff has failed to identify with precision the magnitude of her derivative claims, such that the Court could make a determination of whether it would have made economic sense for Defendants to effectuate a sale of Crunk at a sub-optimal price to avoid liability to Plaintiff and the other Performance Unit holders.  *See id.* at 905-06.

19

While Plaintiff derivatively seeks, in total, $500 million in damages, the allegations in the Amended Complaint provide absolutely no basis for determining why or how Defendants are plausibly liable for that amount.  Therefore, the Court finds that this exception is inapplicable to this case.

To invoke the other equitable exception, recognized in *Miller*, Plaintiff must allege that both the acquired corporation *and* the surviving corporation have engaged in wrongful conduct.  *See Miller*, 268 F. Supp. at 267 ("To hold that the surviving corporation inherits a derivative right of action where said corporation has wrongfully taken part in the very acts complained of would be to reach an incongruous and highly inequitable result."); *see also In re Mercury Interactive Corp.*, 487 F. Supp. 2d at 1137 (noting that "the limited instances in which the exception has been applied indicate that the *surviving* corporation must participate in the fraud in order for the . . . exception to apply" (emphasis in original)).  Here, the Amended Complaint is completely devoid of any plausible allegations from which the Court can infer that Solvi, the surviving entity, engaged in any wrongful or fraudulent conduct.  At oral argument, Plaintiff's counsel attempted to assert that because Crunk and Solvi were represented by the same lawyers, the Loeb Defendants, Halstead's fraudulent intent may be imputed to Solvi and its investors.  However, this would require several implausible leaps that are not supported by the allegations in the Amended Complaint.  For instance, the Amended Complaint contains no allegations that the Loeb Defendants even knew about Halstead's alleged intent in seeking the merger, let alone that they made Halstead's intent known to Solvi or its investors.  Indeed, to the extent that the Amended Complaint touches this point, it only states that Solvi and its investors had knowledge of the existence of the Crunk Operating Agreement and Plaintiff's rights thereto.  (Am. Compl. ¶¶ 187-210.)  However, not only is such knowledge completely unremarkable, given that Solvi

was in the process of purchasing Crunk's assets, these allegations fall far short of plausibly

establishing any fraudulent conduct on the part of Solvi and its investors.  Therefore, the Court

finds that this equitable exception is unavailable to Plaintiff as well.[11]

### b. Demand Requirement

Even if Plaintiff had properly pled allegations that established derivative standing, her

derivative claims still falter because she has failed to meet the "demand requirement," which

requires a derivative complaint "to allege the efforts of the plaintiff to secure the initiation of

[the desired] action or the reasons for not making such effort." *Tzolis v. Wolff*, 884 N.E.2d 1005,

---

[11] At oral argument, Plaintiff's counsel contended that Solvi is a mere continuation of the dissolved Crunk, and that therefore Plaintiff need not demonstrate wrongdoing by Solvi to fit within this exception.  *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003) (noting that under New York law "the purchaser of a corporation's assets does not, as a result of the purchase, ordinarily become liable for the seller's debts," but that "New York recognizes four exceptions to th[is] rule . . . applying to: (1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who de facto merged with a seller; and (4) a buyer that is a mere continuation of a seller").  This argument is nothing more than an attempt at an end-run around the requirements of this equitable exception to reach Plaintiff's desired conclusion that Solvi engaged in fraudulent conduct.  The first three exceptions plainly do not apply here given the lack of any such allegations.

The last exception, the "continuation theory," requires that Plaintiff demonstrate "the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations."  *Graham v. Jones*, 144 F.3d 229, 240 (2d Cir. 1998).  As Defendants note, there is no identity of stock and stockholders between Crunk and Solvi (Reply Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss ("Crunk Defs.' Reply") 6-7), even if Halstead was allegedly the managing executive of both Crunk and Sovli, (Am. Compl. ¶¶ 57, 85).  Moreover, assuming Plaintiff could establish that Solvi is a mere continuation of the dissolved Crunk, that inquiry is separate and distinct from the issue of whether Solvi acted wrongfully during the course of its acquisition of Crunk's assets.  It is the latter inquiry that a court must focus on when determining whether the equitable exception to the continuous ownership rule should apply, and Plaintiff's attempt to establish that Solvi is a mere continuation of Crunk does not rectify Plaintiff's failure to include in the Amended Complaint allegations of wrongful conduct on the part of Solvi or its investors.  In short, Plaintiff's allegations that Crunk and its management fraudulently devalued Crunk in order to effect Crunk's sale and that Solvi is a successor entity to Crunk do not plausibly impute fraudulent conduct during the transaction to Solvi.  Regardless, Plaintiff's failure to make adequate demand on Defendants is fatal to her derivative claims, *see infra* Section II.B.1.b.

1010 (N.Y. 2008) (alterations and internal quotation marks omitted); *see also Hecht ex rel. Andover Assocs. LLC, I v. Andover Assoc. Mgmt. Corp.*, 910 N.Y.S.2d 405 (Table), 2010 WL 1254546, at *6 (Sup. Ct. Mar. 12, 2010) (noting that, under New York law, the demand requirement applies with equal force to LLCs as to corporations).  There are two components to the demand requirement; one procedural, the other substantive.  As to the procedural component, "the pleading of derivative actions must satisfy the requirements set forth in" Federal Rule of Civil Procedure 23.1, which requires that a complaint asserting derivative claims "'state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort.'"  *Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009) (quoting Fed. R. Civ. P. 23.1).  "Rule 23.1 is a rule of pleading that creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question."  *Id.* (internal quotation marks omitted).  As such, "[i]t does not 'abridge, enlarge or modify any substantive right.'"  *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991)).  While Rule 23.1 governs the procedural aspects of the demand requirement, the second, substantive dimension of the demand requirement, which concerns the adequacy of the efforts actually put forth by a plaintiff, is governed by state law.  *See id.*  Therefore, the Court looks to Rule 23.1 to determine whether Plaintiff has adequately pled her derivative claims, and, because Crunk was an LLC organized under the laws of New York, the Court looks to New York law to determine whether Plaintiff has satisfied the underlying demand requirement.  *See id.* at 206 n.7.

Defendants argue that Plaintiff has failed to adhere to any of the pleading requirements contained in Rule 23.1.  (Crunk Defs.' Mem. 17.)  They point out that the Amended Complaint is

not verified, which Rule 23.1 expressly requires.  *See* Fed. R. Civ. P. 23.1(b).  However, "[t]he verification requirement of Rule 23.1 is not intended to be a general impediment to shareholder derivative actions but, rather, to those derivative lawsuits brought solely for the purpose of harassment or to force a quick settlement."  *Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 222 (E.D.N.Y. 2005).  Indeed, "[w]here appropriate, courts allow plaintiffs to cure a verification defect by submitting an affidavit."  *Id.*  Therefore, Plaintiff's failure to verify the Amended Complaint "is not fatal to the lawsuit."  *Id.*

Defendants also contend that Plaintiff has a conflict of interest because she "cannot fairly and adequately represent Crunk [in a derivative action], as [] required by Rule 23.1, while pursuing her own direct claims."  (Crunk Defs.' Mem. 17 (internal quotation marks omitted) (citing *Wall St. Sys., Inc. v. Lemence*, No. 04-CV-5299, 2005 WL 292744, at *3 (S.D.N.Y. Feb. 8, 2005)).)  It is unclear whether there is a per se rule within the Second Circuit prohibiting plaintiffs from simultaneously pursuing derivative and direct claims.  *Compare Kamerman v. Pakco Cos.*, No. 76-CV-3912, 1978 WL 1055, at *2 n.3 (S.D.N.Y. Feb. 6, 1978) (stating that there is no per se rule prohibiting a plaintiff from simultaneously asserting both derivative and direct claims), *with St. Clair Shores Gen. Emp. Ret. Sys. v. Eibeler*, No. 06-CV-688, 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) ("Courts in this Circuit have long found that plaintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest.").  However, it is clear that "courts in this District have applied a strict standard in scrutinizing simultaneous direct and derivative actions for signs of conflict."  *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991); *see also id.* (noting the uncertainty of whether courts in this District apply a per se rule).  "While there is always a theoretical conflict of interest in situations where a plaintiff in a single lawsuit seeks redress on behalf of the

[business entity] and from the [business entity], *Kamerman*, 1978 WL 1055, at *2 n.3, it is

indisputable that "the existence of an actual conflict disqualifies a plaintiff from acting as

representative in these dual capacities," *Ryan*, 765 F. Supp. at 135.

An actual conflict may exist where "[s]ubstantial recovery of the [direct] claim . . .

reduce[s] the potential recovery on behalf of the [business entity] on the derivative claim."

*Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101, 108-09 (S.D.N.Y. 1990); *see also Ryan*, 765 F.

Supp. at 135-36 (discussing "the incompatibility of the relief sought" by the plaintiff);

*Kamerman v. Steinberg*, 113 F.R.D. 511, 516 (S.D.N.Y. 1986) (noting that conflict of interests

exist where "recovery in the [direct] action . . . reduce[s] potential recovery in the derivative

action").  However, any potential conflict of interest in this context, where the types of relief

sought may be incompatible, is substantially diminished where the business entity on whose

behalf the derivative plaintiff sues has been dissolved or is otherwise no longer in existence.  *See*

*Kane Assocs. v. Clifford*, 80 F.R.D. 402, 407-08 (S.D.N.Y. 1978) (holding that where

corporation had sold its assets and been distributed in liquidating dividend, plaintiffs lacked any

"equity interest" in the corporation to create a true conflict between their derivative and direct

claims; rather, the "plaintiffs' derivative claims appear[ed] designed to do no more than to fill

the coffers of [the corporation] so that any . . .  recovery [on a direct claim] [would] be

meaningful"); *see also Ryan*, 765 F. Supp. at 136 (distinguishing *Kane*, where "the corporation

had been completely liquidated," from a situation where a corporation, "whether healthy or not,

remains in existence and can benefit from a recovery in the derivative action"); *Brickman*, 731 F.

Supp. at 109 n.9 (distinguishing *Kane*); *Steinberg*, 113 F.R.D. at 516 (same).  Although *Kane* is

not completely on point, the Court finds that because Crunk has been sold and dissolved, and

Plaintiff in fact concedes that she holds no interest in Crunk, the instant action is much closer to

the situation in *Kane*, where the plaintiff had no equity interest in the corporation on whose behalf she was suing.  Therefore, while acknowledging the "strict standard" that must be applied, the Court finds that Plaintiff has not violated Rule 23.1 by asserting both derivative and direct claims.

Finally, the Court must determine whether Plaintiff has pled her demand efforts with the specificity required by Rule 23.1.  As noted earlier, Rule 23.1 is a rule of pleading, and is not the source of the demand requirement.  Rather, Rule 23.1 "merely requires that the complaint in [a derivative action] allege the facts that will enable a federal court to decide whether [the] demand requirement has been satisfied."  *Halebian*, 590 F.3d at 211 (internal quotation marks omitted).  Here, Plaintiff alleges that she made certain demands to Defendants with respect to the sale and dissolution of Crunk, and attached to the Amended Complaint are two letters sent to Defendants by Plaintiff detailing these demands.  (Am. Compl. Exs. P, Q.)  Accordingly, the Court finds that Plaintiff has pleaded with the specificity required by Rule 23.1.  *See Stoner v. Walsh*, 772 F. Supp. 790, 797 (S.D.N.Y. 1991) ("When the [demand] letters are treated as part of the pleading, plaintiff has set forth the details of her demand with the level of specificity required by Rule 23.1.").  However, as noted above, "the adequacy of the demand, as opposed to the adequacy of the pleading, is a matter of substance governed by state law rather than Rule 23.1."  *Id.*  The Court, therefore, applies the substantive law of New York to determine the adequacy of Plaintiff's demand efforts.

Under the New York Business Corporation Law, which governs the demand requirement for LLCs as well as corporations, *see Tzolis*, 884 N.E.2d at 1010, "[i]n any . . . [shareholder derivative] action the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort."  N.Y.

Bus .Corp. Law § 626(c).  "Demand to sue need not assume a particular form nor need it be made in any special language."  *Ripley v. Int'l Rys. of Cent. Am.*, 188 N.Y.S.2d 62, 72 (App. Div. 1959); *see also Stoner*, 772 F. Supp. at 796.  However, the demand "must inform the board 'with particularity' of the complained of acts and the potential defendants."  *Stoner*, 772 F. Supp. at 796 (quoting *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.,* 273 N.Y.S.2d 16, 25 (Sup. Ct. 1966)).  Specifically, "[a] demand must fairly and adequately apprise the directors of the potential cause of action so that they, in the first instance, can discharge their duty of authorizing actions that 'in their *considered* opinion . . . [are] in the best interests of the corporation.'" *Stoner*, 772 F. Supp. at 796 (quoting *Barr v. Wackman,* 329 N.E.2d 180, 186 (N.Y. 1975) (emphasis in original)).  "The question of whether the demand requirement . . . has been met is a matter within the discretion of the court."  *Lewis v. Akers*, 644 N.Y.S.2d 279, 281 (App. Div. 1996) (omitting citations).

Here, Plaintiff contends that she made "repeated demand[s] on Crunk's management to provide her with a full accounting of the sale of Crunk's assets and subsequent distribution, a copy of the Purchase and Sale Agreement, and a list of names identifying those persons who currently hold interest in Crunk."  (Pl.'s Mem. 14.)  Defendants note that the "demand requirement does not require that a would-be derivative plaintiff send a letter that repeats the word 'demand' as many times as possible . . . rather, it requires that that would-be plaintiff 'demand' that the entity prosecute a potential claim that accrues to it."  (Reply Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss ("Crunk Defs.' Reply") 9-10.)  However, Defendants are correct that, to the extent that Plaintiff made any "demand" on Crunk, that demand was not clearly intended to remedy any alleged violation of law; in other words, Plaintiff's "demand" did not relate in any obvious way to the derivative claims she seeks to assert in this action.

26

Plaintiff's demand letters only demanded access to certain documents and information relating to the Crunk sale — they make absolutely no mention of any potential causes of action that may have been available to Crunk, they do not discuss any damages or payments that may have been due or owing to Crunk, nor do they even mention any possible wrongdoing that may have served as the basis for any derivative action on Crunk's behalf.[12]   Plaintiff's demand, therefore, was clearly inadequate.   Thus, the Court cannot conclude that Plaintiff's demands fairly and adequately apprised Defendants of any potential cause of action.   *See Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 410 (S.D.N.Y. 2007) (finding plaintiff's demand inadequate where complaint merely alleged that plaintiff "advised [d]efendants of his intention to bring a shareholder derivative action," but failed to detail "what wrongful action [the] [p]laintiff wanted [the defendant] to rectify or why"); *Stoner*, 772 F. Supp. at 797-98 (suggesting that demand letter was inadequate as to certain claims referenced therein because the letter failed to indicate "with any specificity the causes of action available to the corporation or those persons potentially liable," and expressly finding demand letter inadequate as to other claims that the letter did not reference at all); *see also Flynn v. Brooklyn City R.R. Co.*, 53 N.E. 520, 524-25 (N.Y. 1899) (noting that in the context of derivative actions, the demand requirement refers to an allegation that "the corporation, on being applied to, refused to prosecute," and finding plaintiff's demand inadequate where he merely sought payment "of what he deemed he was entitled to, or of a distribution among the stockholders of what he deemed they were entitled to," because those demands "could have been complied with . . . without the bringing of an action").

      Notwithstanding Plaintiff's claims that she sufficiently demanded action from Crunk

---

     [12] Also, the demand letter was completely silent as to any claims that Crunk may have had against the Loeb Defendants for their representation of Crunk (and Solvi) during the sale.

management, however, she also argues in her opposition brief, for the first time, that she "has sufficiently stated a basis for asserting futility" because she made "repeated demand[s] on Crunk's management," and Crunk refused to comply.  (Pl.'s Mem. 14.)  Plaintiff misunderstands the concept of demand futility, which may be invoked to excuse a failure to make demand only in certain limited circumstances.  "[A] demand would be futile if a complaint alleges with particularity that (1) a majority of the directors are interested in the transaction, or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction."  *Marx v. Akers*, 666 N.E.2d 1034, 1039 (N.Y. 1996).  Here, Plaintiff did not fail to make a demand; rather, she made an insufficient demand, which was refused by Crunk management, and the Court has found that her efforts were inadequate.  Further, even assuming that demand futility were applicable to the facts here, the Court would not allow Plaintiff to argue its applicability for the first time in her opposition brief.  *See Global Crossing Bandwith, Inc. v. Locus Telecomm., Inc.*, 632 F. Supp. 2d 224, 245 (W.D.N.Y. 2009) ("It is well established that a party cannot assert a claim for the first time in its motion papers."); *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849, 2006 WL 3193709, at *5 n.3 (E.D.N.Y. Nov. 2, 2006) (same).  Accordingly, the Court finds that Plaintiff has not satisfied the demand requirement, as required under New York law, and that she therefore may not pursue her derivative claims.[13]  This includes a derivative claim for a constructive trust that Plaintiff has cross-moved to assert in a Second Amended

---

[13] At oral argument, Plaintiff's counsel suggested that if Plaintiff were to fit within one of the equitable exceptions to the derivative standing requirements, discussed *supra* Section II.B.1.a., then the demand requirement would be excused.  Although the Court has already found that Plaintiff would not be able to invoke either of the equitable exceptions, the Court notes that Plaintiff has cited absolutely no authority supporting the notion that the demand requirement would be excused if an equitable exception applied.

Complaint. (Dkt. No. 38.) Plaintiff's cross-motion to amend is therefore denied on futility

grounds. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A

district court has discretion to deny leave [to amend] for good reason, including futility, bad

faith, undue delay, or undue prejudice to the opposing party.").[14]

---

[14] The Court notes that even if Plaintiff could cure the demand requirement defect, she may still have serious problems asserting at least some of her derivative claims beyond her inability to establish membership in Crunk. For example, although Plaintiff claims that both Crunk and Solvi owed her fiduciary duties, which they allegedly breached, it is not at all clear that a New York LLC owes fiduciary duties to its members. Under New York law, "'a corporation does not owe fiduciary duties to its members or shareholders.'" *Peacock v. Herald Square Loft Corp.*, 889 N.Y.S.2d 22, 23 (App. Div. 2009) (quoting *Hyman v. N.Y. Stock Exch., Inc.*, 848 N.Y.S.2d 51, 53 (App. Div. 2007)); *see also Gates v. BEA Assocs.*, No. 88-CV-6522, 1990 WL 180137, at *6 (S.D.N.Y. Nov. 13, 1990) (same); *Kavanaugh v. Kavanaugh Knitting Co.*, 123 N.E. 148, 151 (N.Y. 1919) ("[N]o trust relation ordinarily exists between . . . the stockholders and the corporation."). And, while no New York court appears to have addressed the issue, it is reasonable to extend the rule governing corporations to LLCs. *See Furchgott-Roth v. Wilson*, No. 09-CV-9877, 2010 WL 3466770, at *5 (S.D.N.Y. Aug. 31, 2010) ("Plaintiff has not cited any authority indicating that a Delaware limited liability company owes fiduciary duties to its members and the Court is not aware of any. In an analogous context, Delaware courts hold that corporations do not owe fiduciary duties to their shareholders.").

Additionally, there are serious questions about Plaintiff's tortious interference with contract claim against Solvi and the Solvi investors. In order to state a claim for tortious interference with contract, Plaintiff must demonstrate: 1) the existence of a valid contract between herself and Crunk; 2) Defendants' knowledge of that contract; 3) Defendants' intentional procurement of Crunk's breach of the contract without justification; 4) actual breach of the contract; and 5) damages resulting therefrom. *See Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). Even accepting Plaintiff's allegations that Solvi and its investors were aware of the Crunk Operating Agreement (Am. Compl. ¶¶ 192-201), it is doubtful whether Plaintiff can plausibly demonstrate that "the Solvi [i]nvestors induced the sale of [] Crunk to [] Solvi" merely "[b]y investing in [] Solvi," (*id.* ¶ 203). Further, even if the Court were to find that these allegations established a causal relationship between the Solvi investors' capitalization of Solvi and Crunk's sale, it is unclear whether the sale constituted a breach of the Crunk Operating Agreement. The operating agreement did not prohibit Crunk from being sold, and Plaintiff, who held only a profits-interest in Crunk, would share in the proceeds of any sale only if the sale netted over $2,000,000, the Grant Floor Value of Plaintiff's Performance Units, *see supra* note 2. (Am. Compl. Exs. D, E.) In other words, under the express terms of the contract, Plaintiff was not guaranteed any amount of money from Crunk's sale, and therefore she will have difficulty demonstrating how "[t]he sale of [] Crunk to [] Solvi was a breach of the [Crunk Operating Agreement]," (*id.* ¶ 205).

Finally, Plaintiff's proposed cause of action for a constructive trust is wanting. To

### 2. Breach of Contract Claims

Plaintiff also asserts claims for breach of contract against both Crunk and Halstead, alleging that pursuant to the terms of the Crunk Operating Agreement, she was entitled to notice of Crunk's impending sale to Solvi — referred to as "Drag Along Notice," (*see* Am. Compl. ¶¶ 213, 218; *id.* Ex. B § 8.5) — and that Crunk and Halstead were obligated, by the terms of the contract, to "hold an election ('Drag[]Along Election') to determine whether minority interest holders would be required to participate in the Sales transaction."  (*Id.* ¶¶ 215, 220; *see also id.* Ex. B § 8.5.)  To state a claim for breach of contract, a plaintiff must allege "(1) the formation of a contract between the plaintiff and the defendant, (2) performance by the plaintiff, (3) the defendant's failure to perform, and (4) resulting damages."  *Brualdi v. IBERIA*, 913 N.Y.S.2d 753, 754 (App. Div. 2010); *see also Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).[15] As to Plaintiff's breach of contract claim against Crunk, Defendants correctly point out that

establish this cause of action, Plaintiff must demonstrate: "(1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment." *Pereira v. Glicker*, 876 N.Y.S.2d 910, 911 (App. Div. 2009).  Plaintiff asserts that as a Performance Unit holder she had fiduciary relationships with both Halstead and Crunk, that she was "induced" to render services to Crunk in exchange for these Performance Units, and that Halstead wrongfully transferred Crunk's assets to Solvi and the Sovli investors, which extinguished her Performance Units.  (Affirm. of Christopher G. Kirby in Supp. of Pl.'s Cross-Motion ("Kirby Affirm.") Ex. A ¶¶ 259, 260, 263.)  Plaintiff does not allege that Crunk, the transferor, had any fiduciary relationship with Solvi or Solvi's investors; she only alleges that she herself shared fiduciary relationships with Crunk and Halstead.  Nor does Plaintiff allege that any promises were made to Crunk or its management.  Plaintiff appears to be attempting to assert that her Performance Units were wrongfully transferred, but in reality they were canceled when Crunk was dissolved, and in any event Plaintiff has not identified any promise that she herself relied on in transferring any interests.

[15] The Court applies New York law to Plaintiff's breach of contract claim pursuant to the terms of the Crunk Operating Agreement, which states that the Agreement "shall be governed by and enforced and construed in accordance with the laws of the State of New York . . . ."  (Am. Compl. Ex. B § 16.7.)

Crunk is not a party to the Crunk Operating Agreement; instead, the Crunk Operating Agreement is the means by which Crunk was created.  (Crunk Defs.' Mem. 20.)  Indeed, the Crunk Agreement states that it was created "by and between each of the Persons . . . executing this Agreement as Members . . . and each Person subsequently admitted as a Member of the Company and/or agreeing to be bound hereby."  (*Id.* Ex. B pmbl.)  The plain language of the Crunk Agreement, and common sense, make clear that Crunk was not a party to the Crunk Agreement, and therefore could not have breached it.  *See Purchase Partners II, LLC v. Max Capital Mgmt. Corp.*, 862 N.Y.S.2d 817 (Table), 2008 WL 1821878, at *2 (Sup. Ct. 2008) ("If the contract allegedly breached was the Max Harlem LLC Agreement, then Max Harlem, which was *formed* by it, could not be in breach of it." (emphasis in original)).  Accordingly, Plaintiff's breach of contract claim against Crunk fails.

Plaintiff's breach of contract claim against Halstead also fails, but for different reasons. As an initial matter, the Court notes that Plaintiff appears to have misunderstood the definition of a "Drag Along Election," as that term is used in the Crunk Operating Agreement.  The relevant provision provides:

> [I]f a Majority of Members . . . elect at any time during the term of this Agreement to sell all of their Units to a third party purchaser . . . the Selling Members shall have the right to cause the other Members and Assignees to sell all of the then issued and outstanding Units owned by such other Members or Assignees to such third party purchaser on substantially the same terms . . . subject, in the case of Performance Units, to differences in price reflecting a Performance Unit's Grant Floor Value (the "Drag Along Election"). . . . The Selling Members may trigger a Drag Along Election by providing written notice of such election (the "Drag Along Notice") to all of the other Members and Assignees, such Drag Along Notice to include the name and address of the third party purchaser, the Aggregate Purchase Price being paid to the Selling Members by such third party purchaser, the proposed date for the closing of such Sale, and such other material terms and conditions of such Sale as determined by the Selling Members.

31

(Am. Compl. Ex. B § 8.5 ("Section 8.5").)  Thus, contrary to Plaintiff's contention that Halstead

and Crunk were obligated to provide her with "Drag Along Notice" prior to Crunk's sale (*id.* ¶¶

213, 218), Drag Along Notice is in fact the means through which a majority of "Selling

Members" could trigger a Drag Along Election to force the sale of all Units.  In other words,

Defendants are correct that the "election" at issue here does not refer to a democratic process

(Crunk Defs.' Mem. 21), and Plaintiff is therefore incorrect when she asserts that the purpose of

the Drag Along Election was to "determine whether minority interest holders would be required

to participate" in Crunk's sale, (Am. Compl. ¶ 215).  On the contrary, the "election" refers to the

right of the Selling Members to essentially force the minority interest holders to sell their Units

on terms negotiated by the Selling Members — the minority interest holders retained no

discretion whether to participate.

In any event, because the Crunk sale did not involve a majority of Crunk members selling

their Units, but instead involved a sale of Crunk's assets to Solvi, Section 8.5 is inapposite, as

the Crunk Operating Agreement expressly distinguishes between the sale of Crunk Units and the

sale of Crunk assets, with Drag Along Rights applying only to the former.  (*See* Am. Compl. Ex.

B § 15.2(c) (distinguishing between asset sales and Unit sales).)  Indeed, there is no indication

that the Drag Along Election was meant to apply to a sale of assets, despite the fact that

according to Section 8.5 the Election right includes the right to cause minority Members to agree

to and consummate any merger, or the formation of any other business combination.  (*Id.* Ex. B

§ 8.5.)  However, even taking as true Plaintiff's claim that Section 8.5 could apply to a sale of

assets (Pl.'s Mem. 17-18), by the express terms of the Crunk Operating Agreement, the Drag

Along Rights belong to the Selling Members, not Plaintiff, and Plaintiff cannot sue to enforce

rights that she does not have.  Halstead did not breach the Crunk Agreement by choosing not to

exercise her Drag Along Rights, which was in her discretion to do.  (Am. Compl. Ex. B § 8.5

("The Selling Members *may* trigger a Drag Along Election . . . ." (emphasis added)).)  Therefore,

Plaintiff's breach of contract claim against Halstead is dismissed.

### 3. Equitable Claims

Plaintiff also asserts claims for an accounting, for access to books and records, and for a

declaratory judgment that she was a member of Crunk at the time of the alleged wrongdoing.

Defendants seek to dismiss these equitable claims, contending that: 1) the accounting claim

cannot stand because Plaintiff seeks access to documents that she already possesses, and that an

accounting is unnecessary because Plaintiff cannot establish, as a matter of law, that she was

entitled to any proceeds from Crunk's sale, which netted under $2,000,000, below the Grant

Floor Value of her Performance Units; 2) the books and records claim fails because Plaintiff

already possesses much of the information requested, and in any event she is no longer a Crunk

member, which she must be in order to enforce a right of access to such information; and 3) any

declaratory judgment would be an improper advisory opinion, as no issues of law in this case

turn on Plaintiff's membership in Crunk at the time of the events in question.  (Crunk Defs.'

Mem. 22-25.)  Plaintiff addressed none of these arguments in her opposition papers.

"In order to maintain an action for an accounting, the party seeking the accounting must

establish the existence of a fiduciary or trust relationship."  *Sipos v. Fastrack Healthcare Sys.,*

*Inc.*, 806 N.Y.S.2d 448 (Table), 2005 WL 1993496, at *4 (Sup. Ct. Aug. 15, 2005); *see also*

*Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009) ("Proof of a

fiduciary relationship is a mandatory element of an accounting claim under New York law.");

*Palazzo v. Palazzo*, 503 N.Y.S.2d 381, 384 (App. Div. 1986) ("The right to an accounting is

premised on the existence of a confidential or fiduciary relationship and a breach of a duty

imposed by that relationship respecting property in which the party seeking an accounting has an interest."). As an initial matter, Plaintiff is already in possession of much of the information she seeks. Based on what Plaintiff has attached to the Amended Complaint, she already has knowledge of the identities of past and current interest-holders in Crunk and Solvi, as well as access to the Asset Purchase Agreement between Crunk and Solvi. (Am. Compl. Exs. C, E, K, L.) More significantly, as discussed in detail above, Plaintiff has not adequately pled that she was actually a member of Crunk at the time of the sale, or at any time at all. Because Plaintiff has not adequately pled her membership in Crunk, she fails to establish the existence of a fiduciary relationship — which is necessary to sustain her accounting claim — as she has not alleged any other basis for finding that she was owed fiduciary duties. *See McGuire Children*, 2009 WL 1693725, at *16 (noting that LLC members share a fiduciary relationship); *Willoughby Rehab. & Health Care Ctr. v. Webster*, 831 N.Y.S.2d 357 (Table), 2006 WL 3068961, at *4 (Sup. Ct. Oct. 26, 2006) (same). And, in any event, Plaintiff's accounting claim names only Solvi and Crunk (*see* Am. Compl. ¶¶ 157-62), and, as noted above, an LLC owes its members no fiduciary duties. Plaintiff has failed to establish an essential element of her accounting claim, and this claim is therefore dismissed.

Plaintiff's claims for access to Crunk's books and records and for declaratory relief are dismissed as well. New York's Limited Liability Company Law is quite clear that rights of access to an LLC's books and records are reserved only for members of an LLC. *See* N.Y. Ltd. Liab. Co. Law § 1102. The Court has already found (and Plaintiff concedes) that Plaintiff was not a member of Crunk when she brought this action seeking Crunk's records. Accordingly, Plaintiff has failed to establish a right of access to Crunk's books and records, and, because Plaintiff has not adequately pled that she ever attained membership in Crunk, the Court cannot

34

grant a declaratory judgment that Plaintiff was a member of Crunk when Crunk was sold to Solvi. Each of Plaintiff's equitable claims is therefore dismissed.

### III. Conclusion

For the reasons stated herein, Defendants' motions to dismiss are granted and Plaintiff's motion to amend is denied. The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 25, 28, 38), and to close this case.

SO ORDERED.

Dated:       White Plains, New York
             September 26, 2011

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

35

Service List (via ECF):

Austin Reis Graff, Esq.
Christopher Gerard Kirby, Esq.
The Scher Law Firm, LLP
One Old Country Road, Suite 385
Carle Place, NY 11514
(516) 746-5040
Fax: (516) 747-9100
Email: agraff@scherlawfirm.com
Email: ckirby@scherlawfirm.com
*Counsel for Plaintiff*

Steven Gary Kobre, Esq.
Danielle Lauren Rose, Esq.
Scott Kurtis McCulloch, Esq.
Kobre & Kim LLP
800 Third Avenue, 6th Floor
New York, NY 10022
(212) 488-1200
Fax: (212) 488-1220
Email: steven.kobre@kobrekim.com
Email: danielle.rose@kobrekim.com
Email: scott.mcculloch@kobrekim.com
*Counsel for the Crunk Defendants*

Claire L. Huene, Esq.
Joel M. Miller, Esq.
Miller & Wrubel, P.C.
570 Lexington Avenue, 25th Floor
New York, NY 10022
(212) 336-3500
Fax: (212) 336-3555
Email: chuene@mw-law.com
Email: jmiller@mw-law.com
*Counsel for the Loeb Defendants*